# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DESTINY MARIE SANCHEZ,<br><br>    Plaintiff,<br><br>    v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | Case No.  1:20-cv-01246-SAB<br><br>ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL<br><br>(ECF Nos. 17, 20, 21) |

## I.

## INTRODUCTION

Destiny Marie Sanchez ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits pursuant to the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]  For the reasons set forth below, Plaintiff's Social Security appeal shall be denied.

/ / /

/ / /

/ / /

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge and the matter has been assigned to the undersigned for all purposes.  (See ECF Nos. 8, 11, 22.)

1

**II.**

**BACKGROUND**

**A.    Procedural History**

On March 1, 2017, a Title XVI application for supplemental security income was protectively filed on behalf of Plaintiff, who was 14 years old at the time, alleging a period of disability beginning on January 1, 2010.  (Admin. Rec. ("AR") 196-207, ECF No. 11-1.)[2]  The written application filed on April 3, 2017.  (Id.)  Plaintiff's application was initially denied on July 7, 2017, and denied upon reconsideration on September 26, 2017.  (AR 93-97, 103-108.)  On April 10, 2019, Plaintiff appeared via video with counsel for a hearing before Administrative Law Judge Dennis LeBlanc (the "ALJ").  (AR 44-71.)  On June 11, 2019, the ALJ issued a decision finding that Plaintiff was not disabled.  (AR 18-43.)  The Appeals Council denied Plaintiff's request for review on April 20, 2020.  (AR 7-12.)

Plaintiff filed this action on September 2, 2020.  (ECF No. 1.)  On March 15, 2021, Defendant filed the administrative record ("AR") in this action.  (ECF No. 11.)  On May 4, 2021, Plaintiff filed an opening brief.  (Pl.'s Opening Br. ("Br."), ECF No. 17.)  On June 23, 2021, Defendant file an opposition brief.  (Def.'s Opp'n ("Opp'n"), ECF No. 20.)  On June 24, 2021, Plaintiff filed a reply brief.  (Pl.'s Reply ("Reply"), ECF No. 21.)

**B.    Hearing Testimony**

Plaintiff appeared with counsel on April 10, 2019, for a hearing before the ALJ.  (AR 46.)  Plaintiff did not testify, however, her stepmother Lynn Rossel ("Ms. Rossel") presented testimony.  The hearing was conducted via videoconference, with the ALJ present in Columbia, Missouri, and the Plaintiff present in Fresno, California.

The ALJ elicited testimony from a psychology medical expert Ricardo Buitrago (the "ME" or Dr. Buitrago).  (AR 47-48.)  Plaintiff left the room at the request of counsel.  (AR 48.)  The ME stated his review of the evidence of record showed Plaintiff had the following medically

---

[2] For ease of reference, the Court will refer to the administrative record by the pagination provided by the Commissioner and as referred to by the parties, and not the ECF pagination.  However, the Court will refer to the parties' briefings by their ECF pagination.

determinable mental impairments: developmental disorders of scholastic skills, mild, and of unspecified developmental disorder. (AR 49.) Based on his assessment, the ME concluded that Plaintiff does not present with an impairment that would meet or equal the listing under the child mental health disorders, considering 112.02 and 112.11. (AR 49.)

AS for the functional domain assessments for children under the regulations, the ME assessed learning information as less than marked; attending and completing tasks as less than marked; interacting and relating with others as none; moving and manipulating objects as none; caring for yourself as none; and health and physical well being as none. (AR 49-50.) The ME reached these conclusions based on: some difficulties with learning, specifically with math and space skills; IEPs[3] indicating that she was approximately at an 80% level in general education, 72% of general educational time, and could extend the day; the time spent on study skills and math drills; a lower ratio of students to teacher, of 1:13; that she had a course study planning for the school year; that her grades fluctuate but generally saw the grades became C's and A's; that there were some F's and D's, but the majority of them were A's and C's; notations that indicated the grades were affected primarily for her making up work when she was absent; her total GPA as of December 6, 2017, was 2.86 and there were times when it went up as high as 3.14 for a quarter; a teacher's questionnaire in the file from 2017. The ME stated that generally the domains were such that the limitations were none to mild, with functional impact in the areas of applying the information and attending and completing tasks, and noted no significant emotional related issues at school. The ME reviewed a psychological assessment done on May 22, 2017, and acknowledged the assessor wasn't able to complete IQ testing because Plaintiff left or didn't want to complete the testing. However, the ME noted the assessor thought her functional assessment to be age appropriate with some evidence of mental symptoms, but that the symptoms were more of a family factor where Plaintiff was having more of general teenage oppositional issues with her parents and having struggles with the mom and dad. (AR 50-51.)

The ME stated he did not see any individual therapy notes, that there were some notes

---

[3] An "IEP" is an Individual Education Program. See L.M. v. Capistrano Unified Sch. Dist., 556 F.3d 900, 905 (9th Cir. 2009).

that were referenced as psychiatric management notes, but the ME did not see any medication being administered either.  (AR 51.)

The ME was then examined by Plaintiff's counsel.  (AR 51.)  The ME answered that Ex. 5-F, which gave several marked and extreme findings, was not congruent with the records the ME reviewed.  The ME also confirmed review of Ex. 8-F from Dr. Sheldon.  Counsel asked if regardless of the reasons for her psychological issues, whether they would still impact Plaintiff's ability to function, and the ME stated that they may, but that is not what the records indicate. Rather, the ME stated the records indicated the times she attended therapy session, namely the four sessions that ME noted, there were issues more related to the home issues, like for example having tensions at home, being angry with her parents because she wanted a dress and they wouldn't get it.  The ME said that is in conflict with what he saw when he looked at the school records, which indicated she generally gets along with her peers, gets along with her teachers, and therefore the ME stated there were no interpersonal issues regarding opposition or tantrums or behavior issues in school.  (AR 52.)

The ME confirmed he considered the narrative of the teacher's questionnaire at Ex. 5-E, and specifically the fact this is one of the classrooms where Plaintiff has a 1:13 ratio, which is one of the accommodations Plaintiff has, and the ME stated this "means that she is responding to the accommodation."  (AR 52-53.)

Counsel asked whether the ME could discern from the record whether the other students in this ratio class were general students, or part of a special education class, and the ME stated his assumption would be that those students have some level of deficit and so are in the 1:13 classroom.  Counsel asked about Plaintiff's progress with grades despite the accommodation, and the ME stated he saw report cards and a couple areas where they had grades and saw for the most part the A's and B's, and noted a C and D here and there, but emphasized it was specifically noted in the last IEP that the primary reason grades were affected previously was because work was not being completed when Plaintiff was absent from school.  (AR 52-53.)  Counsel asked the ME about an English class as noted to be an F, and whether the ME could discern whether or not an F grade had to do with attendance or whether that had to do with her inability to acquire new

information or remember, and the ME answered that he didn't see evidence indicating that a grade in English for an F was due to her inability to translate information or be able to perform due to deficits in English.  (AR 53.)  Counsel asked if there was evidence about the absences causing such, and the ME stated that Ex. 7F at 19, was one of the times noted that Plaintiff needs to complete assignments when she is absent and also complete in class assignments, in reference to one of her D grades.   The ME stated the IEP team discussed the current classroom performance with Plaintiff and indicated she had a D, and that she needs to complete assignments from when she was absent and also complete in-class assignments. (AR 54.)  The ME stated this instruction from the IEP team was certainly related to the grade as it was noted right after.  (AR 55.)

Counsel highlighted the report also noted Plaintiff spent 14% of her school week in special instruction, which the ME confirmed as accurate.  (AR 55.)  When asked if he knew why she was in this program, the ME stated they wanted to enhance her study skills and wanted to help her with math skills.

When asked if there is a learning deficit that results in being put in such a program, the ME answered that generally, it varies why a student may be in such program, and such students could have anxiety about a subject, or need help organizing.  The ME stated accommodations are delayed, and in the IEP, it provides that some of the skill sets they were working with her on, such as helping to enhance study skills, noting for example that the IEP stated her study skills grade is an A because she has been more conscientious with students, that it stated Plaintiff had incredible assignments and helps other student, and so the grades translate to instances where she is absent or missing assignments.  The ME highlighted that that the IEP noted a 51% or an F grade, stating she was missing assignments and had low quiz and test scores.  Counsel then asked about biology class, and the ME highlighted there that it says she does not complete assignments when absent and does not complete in class assignments, stating that any student that does not do this will have impacted grades.  (AR 56.)  The ME stated there was no indication in the records that there are deficits related to biology, opining that rather the evidence indicates she may struggle with math skills, achievement testing scores and related items, and so the ME was not

surprised there was an accommodation consistent with math and her math classes. The ME testified that he looked at the totality of the records, at the functioning, at communication development as age appropriate, gross and fine motor development as age appropriate, social and emotional behavior as age appropriate, and interactive skills as age appropriate. (AR 57.)

The stepmother Ms. Rossel was then examined by counsel. (AR 58.) Plaintiff lives with Ms. Rossel. (AR 59.) Plaintiff began attending a charter school in Hanford, California, named Learn for Life, King's Academy. Plaintiff began attending one year before. Plaintiff previously attended L'Amour High. Plaintiff received services at the previous school. Plaintiff stopped attending the previous school because her counselor informed her that she would have to do summer school in order to graduate because she couldn't keep up with the work. (AR 59.)

As for accommodations at the previous school, Plaintiff had a special day class that she went to; attended after school tutoring; and attended tutoring through another program outside of school. (AR 59-60.) Plaintiff still struggled with her grades despite the tutoring. Plaintiff struggled the most with math. (AR 60.) Ms. Rossel stated that other classes like world history and biology were adjusted to her mental and learning capabilities, and thus the things she had to complete to get a certain grade weren't the same as a regular class. The class was mixed with normal and special education children. Ms. Rossel attended the IEP sessions.

Ms. Rossel stated that Plaintiff's math teacher told her that if the teacher sits with Plaintiff, she can do to he work, but once she walks away she can't retain the new information. (AR 61.) Plaintiff's teachers would call Ms. Rossel about missed assignments, and Plaintiff did have a special period that was just to help with those assignments she could not complete. Plaintiff tried to complete her work, but she could not finish it. Plaintiff transferred schools in order to complete and graduate, and the new program was different in a way that would allow her to complete sufficient classes to graduate. (AR 61-62.) The new school has more one on one time with teachers with small classes and less students. The new teacher helps her, they sit together, and there is a tutor there all day in every subject. (AR 62.) Plaintiff utilizes the tutor, but her grades still fluctuate, and Ms. Rossel stated they currently fluctuate between A's and F's. In the new school, the teacher will usually send her home with a packet to do work again, to

avoid receiving an F.  Plaintiff will work through the packet with the teacher and tutor at school, and with the private tutor with the work at home.  Plaintiff is on track to receive her high school diploma.  (AR 62.)

In addition to the ratio, Ms. Rossel stated that Plaintiff receives extra time on tests, gets one on one time with teachers, and the work is accommodated to her capability, such as being limited to basic math.  (AR 63.)  When asked about the ME's reference to family issues as a cause of problems, and whether Plaintiff receives therapy, Ms. Rossel stated that therapy for "that" ended in 2011.  When asked about records in 2017, Ms. Rossel stated those pertained to family therapy, and counsel implied these were the type of therapy he was asking about, in that Ms. Rossel confirmed they would speak about things such as things that happened at school or at home.  (AR 63.)

Ms. Rossel confirmed that Plaintiff does express her difficulties with struggling with learning.  (AR 63-64.)  Ms. Rossel testified that people don't understand Plaintiff's difficulty unless they are with her every day.  Ms. Rossel stated that she has to teach her every day how to brush her teeth or wash her own clothes; and that she is almost 17 but doesn't know how to cook despite being sent for a six to eight week cooking class at a local college.  (AR 64.)  Plaintiff took a life skills class in high school that taught things such as how to maintain a menstrual cycle, feminine hygiene, brushing hair and teeth, but Ms. Rossel stated Plaintiff still receives in-home care for those things after the class.  (AR 64.)  Such in-home care has been going on for two years.  (AR 65.)  The in-home provider helps with her menstrual cycle, and with showering because she has to "be walked through it, on how to shampoo her hair, how to wash her body." (AR 65.)

Plaintiff has seen Dr. Sheldon since 2017, and goes in every couple of months.  Counsel confirmed that was around the time of the filing for benefits, and so from that time until about the end of the year prior to the hearing, Dr. Sheldon was involved.  Dr. Sheldon was provided with her school records.  (AR 65-66.)

Ms. Rossel was then examined by the ALJ.  (AR 66.)  The ALJ inquired about Plaintiff's better performance in some subjects, and Ms. Rossel stated that the ones she understands are the

modified classes, but when she is given new work, she can't comprehend it.  Ms. Rossel stated that "modified" means Plaintiff's math class is like first or second grade level, and stated they tried bringing reading up to a junior high level but Plaintiff can't comprehend it.  Ms. Rossel confirmed Plaintiff would graduate that year and that the local community college has an awesome special education program that Plaintiff plans on attending after graduation.

Plaintiff does not have a driver's license and went through driver's education twice.  (AR 67.)  Plaintiff did not pass the class.  Plaintiff has never worked a job.  Plaintiff has a cell phone.  Ms. Rossel stated she had never seen Plaintiff on the computer, but that she does use the cell phone for texting, calling, and has an Instagram account.  (AR 68.)  Plaintiff does not play video games, though she has attempted but could never pick it up.  Ms. Rossel stated she tried playing video games maybe around age 12 or 13, she would get on them for a few minutes, but couldn't figure it out and didn't want to play anymore.

Plaintiff's favorite thing to do is watch cooking channels, has an interest in cooking, and that is why she took the cooking class.  (AR 68.)  Plaintiff also really wanted to be a nurse since a young age.  Plaintiff does not participate in any sports or after school activities.  (AR 68-69.)  Plaintiff was on the track team at one point in high school.  (AR 69.)  Ms. Rossel stated she tried running for the team, but she quit after a week.  When asked if she knew why she quit, Ms. Rossel stated she didn't ask her, that she seemed upset about it, and that she tried volleyball but couldn't understand the concept of the game.  Ms. Rossel did not provide any additional examples of where in the previous years Plaintiff had tried to participate in something but failed, stating that if Plaintiff doesn't understand something she just won't do it.

Counsel then asked Ms. Rossel about the driving class's failure, and Ms. Rossel stated Plaintiff could not pass the final written exam, but she would sit through the lecture portion. (AR 70.)  Ms. Rossel stated she doesn't think Plaintiff should drive.  (AR 71.)

Counsel made concluding remarks that along with reports from the school and the consultative examination report, Plaintiff would meet listing 112.05, as Ms. Rossel testified to some adaptive issues that she needs help with personal hygiene.  Alternatively, counsel argued Dr. Sheldon as the long term treating source should be entitled to greater weigh than the non-

examining physician that presented testimony as the medical expert.  (AR 70-71.)

C.      **The ALJ's Findings of Fact and Conclusions of Law**

The ALJ made the following findings of fact and conclusions of law as of the date of the decision, June 11, 2019.

- Plaintiff was born on May 16, 2002.  Therefore, she was a school-age child on March 1, 2017, the date application was filed, and is currently an adolescent.

- Plaintiff has not engaged in substantial gainful activity since March 1, 2017, the application date.

- Plaintiff has the following severe impairments: developmental and learning disorder.

- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

- Plaintiff does not have an impairment or combination of impairments that functionally equals the severity of the listings; has less than marked limitation in acquiring and using information; has less than marked limitation in attending and completing tasks; has no limitation in interacting and relating with others; has no limitation in moving about and manipulating objects; has less than marked limitation in the ability to care for herself; has no limitation in health and physical well-being; and thus does not have an impairment or combination of impairments that result in either marked limitations in two domains of functioning or extreme limitation in one domain of functioning.

- Plaintiff has not been disabled, as defined in the Social Security Act, since March 1, 2017, the date the application was filed.

(AR 21-39.)

### III.

### LEGAL STANDARD

An individual under the age of 18 will be considered disabled if they have "a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or

can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.906. The Social Security regulations provide a three-step process in determining whether a child is disabled. See 20 C.F.R. § 416.924. First, the ALJ must determine whether the child is engaged in substantial gainful activity. 20 C.F.R. § 416.924(a). If the child is not engaged in substantial gainful activity, then the analysis proceeds to step two. Step two requires the ALJ to determine whether the child's impairment or combination of impairments is severe. Id. The child will not be found to have a severe impairment if it constitutes a "slight abnormality or combination of slight abnormalities that causes no more than minimal functional limitations." 20 C.F.R. § 416.924(c) However, if there is a finding of severe impairment, the analysis proceeds to the final step which requires the ALJ to determine whether the impairment or combination of impairments "meets, medically equals or functionally equals" the severity of a set of criteria for an impairment in the listings. 20 C.F.R. § 416.924(d).

An impairment will be found to be functionally equivalent to a listed impairment if it results in marked limitations in two areas or extreme limitations in one area of functioning. 20 C.F.R. § 416.926a(a). To determine functional equivalence, the following six domains, or broad areas of functioning, are utilized: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for yourself; and (vi) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). Limitations in functioning must result from the child's medically determinable impairments. See 20 C.F.R. § 416.924a(a).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which,

1   considering the record as a whole, a reasonable person might accept as adequate to support a

2   conclusion."  Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of

3   Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

4        "[A] reviewing court must consider the entire record as a whole and may not affirm

5   simply by isolating a specific quantum of supporting evidence."  Hill, 698 F.3d at 1159 (quoting

6   Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006).  However, it is not

7   this Court's function to second guess the ALJ's conclusions and substitute the court's judgment

8   for the ALJ's.  See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is

9   susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be

10  upheld.").

11                                              **IV.**

12                              **DISCUSSION AND ANALYSIS**

13       Plaintiff argues the ALJ erred for two reasons: (1) the ALJ erred finding Plaintiff's

14  developmental and learning disorders did not functionally equal the relevant listings; and (2) the

15  ALJ erred by failing to provide specific and legitimate reasons for discounting the treating

16  medical source opinion of Roger Sheldon, Ph.D ("Dr. Sheldon").  (Br. 5.)

17       Before turning to these challenges, the Court notes Defendant highlights the narrow

18  framing of Plaintiff's appeal, in that the first challenge is limited to a proffer that Plaintiff had

19  marked limitations in the domains of acquiring and using information, and in attending and

20  completing tasks, and the second challenge is limited to the weighing of Dr. Sheldon's opinion.

21  Defendant submits that because Plaintiff has not substantively challenged the ALJ's evaluation

22  of any medical opinion other than Dr. Sheldon's, Plaintiff has thereby conceded to the ALJ's

23  evaluation of and weight assigned to the opinions of testifying medical expert Dr. Buitrago,

24  consultative examiner Dr. Izzi, and State agency psychological consultants Drs. Solomon and

25  Schwartz.  Defendant argues that this is in addition to not challenging the ALJ's finding that her

26  alleged symptoms and limitations were not entirely consistent with the medical and other

27  evidence in the record, and more specifically; the ALJ's decision to give only "partial weight" to

28  stepmother Ms. Rossel's testimony for the reasons stated in the decision.  Plaintiff has not

addressed Defendant's arguments in this regard, in her reply.  (See Reply

The Court largely agrees with Defendant that Plaintiff has waived specific challenges to the ALJ's evaluation of Drs. Buitrago, Izzi, Solomon, and Schwartz's opinions, as well as Ms. Rossel's testimony.  See Carmickle v. Comm'r of Soc. Sec., 533 F.3d 1155, 1161 (9th Cir. 2008) ("We do not address this finding because [claimant] failed to argue this issue with any specificity in his briefing.").  The Court will nonetheless address the merits of Plaintiff's arguments as to whether the ALJ's challenged determinations are free from harmful error, and will address the ALJ's use of these opinions and evidence when or as utilized by the ALJ in making the challenged determinations, and where relevant to Plaintiff's arguments as specifically presented below.

**A.      Whether the ALJ Erred in the Functional Equivalence Determination**

The Social Security regulations provide that if a severe impairment does not meet or medically equal any listing, they "will decide whether it results in limitations that functionally equal the listings." 20 C.F.R. § 416.926a(a).  A severe impairment functionally equals a listing if it results in "marked" limitations in two domains of functioning or in an "extreme" limitation in one domain.  Id.

> We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities.  Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities.  "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme."  It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

20 C.F.R. § 416.926a(e)(2)(i).  A child of any age will be found to "have a 'marked' limitation when [they] have a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and [their] day-to-day functioning in domain-related activities is consistent with that score."  20 C.F.R. § 416.926a(e)(2)(iii).  Standardized testing provides important information about deficits in development and functioning in terms of standard deviations and percentiles.  20 C.F.R. § 416.926a(e)(1)(ii), (e)(2)(iii).  However, test scores alone

do not establish marked or extreme limitation in a domain.  20 C.F.R. §§ 416.924a(a)(1)(ii), 20 C.F.R. 416.926a(e)(4).  No single piece of information taken in isolation can establish whether the child has a "marked" limitation in a domain.  20 C.F.R. § 416.926a(e)(4)(i).

The Commissioner is to consider test scores together with reports and observations of school personnel and others.  20 C.F.R. § 416.924a(a); 20 C.F.R. § 416.926a(e)(4)(ii).  In assessing functional equivalence, the ALJ also considers how much extra help the child needs, how independent they are, how they function in school, and effects of medication or other treatment.  20 C.F.R. § 416.926a(a).  In evaluating this type of information, the ALJ considers how the child performs activities as compared to other children of the same age who do not have impairments.  20 C.F.R. § 416.926a(b).  This information comes from examining and non-examining medical sources as well as "other sources," such as parents, teachers, case managers, therapists, and other non-medical sources who have regular contact with the child.  See, e.g., 20 C.F.R. § 416.913(a)(2), (d); Social Security Ruling (SSR) 98–1p, IV.B. (Sources of Evidence ).

In making a determination of disability, "the ALJ must consider the 'combined effect' of all the claimant's impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity."  Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003) (quoting 20 C.F.R. § 416.923).  "However, in interpreting the evidence and developing the record, the ALJ does not need to 'discuss every piece of evidence.' "  Howard ex rel. Wolff, 341 F.3d at 1012 (citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998); and Vincent v. Heckler, 739 F.2d 1393, 1394–95 (9th Cir. 1984)).

### 1.    The Specific Challenged Domain Findings

In finding Plaintiff's mental impairments did not functionally equal the Listings, the ALJ assessed that Plaintiff had less than a marked limitation in her ability to acquire and use information, and a less than marked limitation in her ability to attend and complete tasks. Plaintiff argues that contrary to the ALJ's findings, the evidence established that Plaintiff had marked limitations in these functional categories and, thus, Plaintiff's mental impairments functionally equaled the Listings.

In the domain of acquiring and using information, the agency "considers how well you

acquire or learn information, and how well you use the information you have learned."  20 C.F.R. § 416.926a(g); SSR 09-3p (S.S.A. Feb. 17, 2009), available at 2009 WL 396025.  The regulation provides the following:

> (v) Adolescents (age 12 to attainment of age 18). In middle and high school, you should continue to demonstrate what you have learned in academic assignments (e.g., composition, classroom discussion, and laboratory experiments). You should also be able to use what you have learned in daily living situations without assistance (e.g., going to the store, using the library, and using public transportation). You should be able to comprehend and express both simple and complex ideas, using increasingly complex language (vocabulary and grammar) in learning and daily living situations (e.g., to obtain and convey information and ideas). You should also learn to apply these skills in practical ways that will help you enter the workplace after you finish school (e.g., carrying out instructions, preparing a job application, or being interviewed by a potential employer).

20 C.F.R. § 416.926a(g)(2)(v).  Thus, the agency considers whether the claimant: demonstrates the ability to learn in academic assignments; applies learning to daily situations without assistance; comprehends and expresses simple and complex ideas using increasing complex language in academic and daily living situations; learns to apply knowledge in practical ways that will help in employment; plans ahead for future activities; and begins realistic occupational planning.  S.S.R. 09-3p; see also Ferrel v. Comm'r of Soc. Sec., No. 2:16-CV-00126-MKD, 2017 WL 3612858, at *5 (E.D. Wash. Aug. 22, 2017) ("Limitation in this domain may be shown by poor grades or inconsistent academic performance, 'provided they result from a medically determinable mental or physical impairment(s).' ") (quoting S.S.R. 09-3p).  Plaintiff highlights that an example of impairment-related limitations in this domain would be the claimant's inability to read, write, or do arithmetic at an appropriate grade level.  (Br. 6, citing S.S.R. 09-3p.)

In the domain of attending and completing tasks, the agency "considers how well you are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them." 20 C.F.R. § 416.926a(h); see also S.S.R. 09-4p (S.S.A. Feb. 18, 2009), available at 2009 WL 396033.  The regulation provides the following:

(v) Adolescents (age 12 to attainment of age 18). In your later years of school, you should be able to pay attention to increasingly longer presentations and discussions, maintain your concentration while reading textbooks, and independently plan and complete long-range academic projects. You should also be able to organize your materials and to plan your time in order to complete school tasks and assignments. In anticipation of entering the workplace, you should be able to maintain your attention on a task for extended periods of time, and not be unduly distracted by your peers or unduly distracting to them in a school or work setting.

20 C.F.R. § 416.926a(h)(2)(v).  Plaintiff highlights that examples of limitations in this domain include needing extra supervision to stay on task, and a slowness to focus on or failure to complete activities that interest the child.  (Br. 6-7 (citing S.S.R. 09-4p.)

### 2.   Plaintiff's Primary Arguments and Citations to Record

Plaintiff highlights the record shows: Plaintiff attended special education due to a learning disorder (AR 231, 393); testing conducted in November 2017 (the Wechsler Individual Achievement Test (WIAT-III)) showed that Plaintiff scored in the lower range on oral comprehension, expressive vocabulary, oral language, mathematics, and math fluency (AR 439); Plaintiff scored below average on a majority of other achievement categories, including sentence composition, reading comprehension, and written expression (AR 439); Plaintiff's teacher noted that she struggled with comprehension (AR 385); that due to her learning disorder, Plaintiff received accommodations at school, including 472 minutes per week of special education, repeated instructions as needed, use of a calculator during math, extended time of 3 days on all assignments, and additional time to finish tests and quizzes (AR 393); and that despite these accommodations, Plaintiff had failing or close to failing grades in several classes (AR 305, 394).

Additionally, Plaintiff highlights certain aspects of Ms. Rossel's testimony, which the Court summarized more fully above.  Specifically, that Plaintiff had transferred schools in her final year of high school in order to graduate because her new school offered much smaller classrooms, one-on-one support, and a tutor available each day for every subject, and that with the additional support, Plaintiff was on track to obtain her high school diploma, but her grades fluctuated between A's and F's.  (AR 62.)  Ms. Rossel also testified Plaintiff was struggling with her activities outside of school, that Plaintiff attended a cooking class at the West Hills College

but she was unable to learn how to cook, and that Plaintiff received in-home support for personal care.  (AR 62-64.)

Plaintiff directs the Court to the records of Plaintiff's treating psychologist, Dr. Ronald Sheldon, who repeatedly observed during therapy sessions that Plaintiff had poor insight and judgment; made minimal progress toward goals in regards to her neurodevelopmental disorder; and opined in August 2017 that Plaintiff had marked to extreme limitations in her ability to acquire and use information, and her ability attend and complete tasks.  (AR 331, 340, 354, 357, 360, 397).

Plaintiff argues this foregoing evidence supported the existence of marked limitations in the domains of acquiring and using information, as well as attending and completing tasks. Plaintiff submits that she functioned far below her grade level in reading comprehension, listening comprehension, math fluency, as well as other subcategories (AR 437); that she required additional supervision and support to complete schoolwork (AR 259, 393); and that her treating psychologist noted that she had poor attention to school and home duties, with poor follow through on chores, and difficulty with organizing tasks and becoming distracted (AR 362).

Plaintiff states the ALJ found Plaintiff had less than marked limitations despite this evidence, based on: school records that showed Plaintiff had the ability to do well in some subjects at school indicating that she had the ability to acquire and use information; and the fact that Plaintiff was on course to graduate and planned on studying culinary arts at the community college.  (AR 33.)  Plaintiff submits the ALJ's inferences that Plaintiff had less than marked limitations because she did well in certain subjects and was on course to graduate ignored material information, as for example, Plaintiff contends she was only on course to graduate, and only maintained fair to good grades in certain academic subjects, because she had significant accommodation and structure in her schoolwork.  (AR 62, 393).  Plaintiff states the record evidence did not suggest that Plaintiff could plan, manage her time, or organize *independently* to complete assignments, SSR 09-4p, and that the evidence strongly suggested that Plaintiff was not reading, writing, or doing arithmetic at appropriate grade level, SSR 09-3p.  Further, Plaintiff

1   argues that with respect to Plaintiff's post-high school plans, the evidence does not suggest that

2   she would be able to achieve her career goals without ongoing support and accommodation, as

3   Ms. Rossel testified Plaintiff's attempt to learn culinary skills had failed; and testified that

4   Plaintiff wanted to go to West Hills Community College, but she would only be able to do so

5   because the college did not have an entrance examination, and they had a strong special

6   education program.  (AR 64, 67.)

7          3.      Defendant's Primary Arguments

8          Defendant responds that in evaluating the functional domains, the ALJ reviewed the

9   entire record consisting of the medical evidence, the educational records; and lay witness

10  testimony from Plaintiff's stepmother Ms. Rossel.    (AR 25–39.)    Significantly, four

11  psychologists concurred that Plaintiff did not have marked limitations in the domains of

12  acquiring/using information or attending/completing tasks, and therefore she did not functionally

13  equal the Listings: (1) Dr. Buitrago who testified at the hearing as a medical expert (AR 49-50);

14  (2) Dr. Solomon (AR 76-77); Dr. Schwartz (AR 87-88); and Dr. Izzi (AR 350).

15         In addition to waiver, Defendant argues that instead of addressing these opinions,

16  Plaintiff relies on her stepmother Ms. Rossel's testimony and Dr. Sheldon's opinion, which

17  Defendant submits "stood in stark contrast to every other opinion of record."  Defendant submits

18  Plaintiff is requesting the Court to reweigh evidence, which is not permitted in a substantial

19  evidence review, and that substantial evidence supported the ALJ's determination that Plaintiff

20  was not disabled.

21         4.      The Court finds the ALJ's Domain and Listing Findings to be Supported by
                    Substantial Evidence and Plaintiff has not Demonstrated Remandable Error
22

23         In concluding the Plaintiff has less than a marked limitation in acquiring and using

24  information and in attending and completing tasks, the ALJ relied on the ME testimony, the

25  nonmedical examiners, school records, and considered Ms. Rossel's testimony:

26              Other than Dr. Sheldon's opinion, the DDS nonmedical examiners,
                and Dr. Builtrado support the [finding] claimant has less than
27              marked limitations in acquiring and using information.   The
                claimant's school records support that she is able to do well in
28              some subjects yet not others, which supports the claimant, has the

ability to learn and acquire information, and thus the less than marked limitation in this domain is appropriate.  Ms. Rossel testified the claimant is on course to graduate from high school, and she plans to attend West Hills Community College as they have a special education program, and the claimant intends to pursue culinary arts.

The evidence supports less than marked limitations in attending and completing tasks.  The testifying medical expert, Dr. Builtrado testified the claimant has less than marked limitations . . . .The evidence supports although the claimant has some difficulty attending and completing tasks, they are not at a marked level.  Furthermore, the claimant's special education teacher referenced the claimant has limitations that range from no problem to an obvious problem, and a fair interpretation of her opinion as well as her explanation with respect to her opinion, does not support marked limitations.  Notably, the teacher questionnaire supports when the claimant sits near the teacher and seeks her assistance her ability improve with respect to attending and completing tasks.

(AR 33-34.)[4]   The Court will first discuss the ALJ's reliance on the ME's testimony.  The ALJ made the following findings, relying in part on Dr. Buitrago's opinion:

In terms of the claimant's alleged fully disabling developmental and learning disorder, the medical evidence of record confirms she has some difficulty in learning, acquiring and using information and attending and completing tasks.  In addition the claimant has received academic support in the form of small group settings, tutoring, and accommodations during examinations as she is allowed additional time.  In addition, she receives some In House Supports with respect to learning how to do the laundry, dress, menstrual care, bathing and oral hygiene, grooming accompanying the claimant to medical appointments and accompanying claimant to alternate resources.  Therefore, the medical and educational evidence of record indicates that she does have some functional difficulties.

However, the evidentiary record including the testimony of Dr. Buitrado dos not support Ms. Rossel's testimony regarding the severity of the claimant's symptoms and functional limitations.  The school records when read in conjunction with Ms. Rossel's testimony at the hearing do show some learning difficulties and many areas that fall in the below average range.  However, in balancing the evidence, while the claimant performs below her

---

[4]   As for the ALJ's citation to the fact that Plaintiff was on track to graduate high school and planned on attending a culinary class at the community college the Court notes the ALJ *may* have conflated the culinary class with the future attendance at the community college, as Ms. Rossel did testify that Plaintiff already attempted and failed at a multi-week culinary course.  However, the parties briefing does not focus on this potential conflation, and to the extent it may constitute error, the Court would find it harmless given the ALJ's citation to the fact of Plaintiff is planning to attend the community college with a special education program, and does maintain a strong interest in the culinary arts.  Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012) ("we may not reverse an ALJ's decision on account of an error that is harmless . . . the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.") (citations omitted).

peers in some subjects, there are subjects in areas where the claimant has been able to perform better. (In other words, she does not have across the board low grades and scores, but appears to be able to perform well in some areas suggesting an ability to learn. While Ms. Rossel testified the claimant's courses are modified to allow her to do well, the testing results do show she is able to reach near grade level in some areas). In addition, the claimant is on course to graduate high school and reportedly plans to pursue college in culinary arts at the West Hills Community College.

(AR 29.) The Court notes that the ALJ gave partial weight to the ME's testimony, accepting the opinion that Plaintiff has less than marked limitations in acquiring and using information and in attending and completing tasks, but instead of accepting the opinion that Plaintiff had no limitations in the other areas, concluded Plaintiff did have less than marked limitations in the other domains. (AR 30.)

Above, the Court summarized the entirety of the ME's testimony at the hearing. Specifically, the ME Dr. Buitrago reviewed the entire record, including all of Plaintiff's medical records and all of the educational records submitted prior to the hearing date, and concluded that she had less than marked limitations in the relevant functional domains. (AR 20, 48-49.) Dr. Buitrago based this on Plaintiff's range of grades, identified as mostly A's to C's with some lower grades too; that her GPA went as high as a 3.14 in one quarter; and that the record indicated that her lower grades were "more primarily" due to Plaintiff missing classes and needing to make up assignments. (AR 50, 53-54.) Dr. Buitrago identified various educational records in support of his opinion, including notations from teachers regarding missing assignments and absences (AR 54–55, citing AR 385 ("Mrs. Schweizer indicated that Destiny currently has a D (58.74%). Destiny needs to complete assignments from when she is absent and also complete the in-class assignments").) Dr. Buitrago considered a questionnaire completed by Plaintiff's teacher, who assessed that Plaintiff's limitations ranged from none to mild, which supported the conclusion that her limitations were less than marked. (AR 50, 259–260 (rating Plaintiff as having mostly "No problem" or "A slight problem" in activities related to acquiring/using information and attending/completing tasks).)

During the hearing, Plaintiff's counsel questioned Dr. Buitrago about whether her F grade

in English was due to an inability to acquire/remember new information, and the doctor responded that he "didn't see evidence anywhere indicating that a grade in English for an F was due to her inability to translate information or be able to perform due to deficits in English." (AR 54.)  Dr. Buitrago noted Plaintiff received an A- in her study skills class, and was described in the referenced report as a "[v]ery conscientious student" that was "current on all assignments and helps other students in class."  (AR 56, 373.)  In contrast, the IEP reflected that Plaintiff's F in English was due to "4 missing assignments and low quiz and test scores," which, as noted by the ME, was at least in part due to absences/missing assignments.  (AR 56, citing AR 373.)  Similarly, Plaintiff's D grade in biology was reported as due to "3 missing assignments" and "[l]ow quiz/test scores," with the ME noting at the hearing that Plaintiff's teacher emphasized in the report that "Destiny does not complete assignments when absent and does not complete in-class assignments."  (AR 56, citing AR 373).  Based on the doctor's review of the records, the ME stated there was "no indication to me in these records that are deficits related to biology, but rather indicated to the ME that "she may struggle with the math skills and that's evident, achievement testing scores and so, I am not surprised there is an accommodation consistent with the math, her math skills and math classes . . . [but] look[ing] at the totality of the records . . . the child's functioning . . . if you look at communication development, social and emotional behavior, age appropriate . . . Interactive skills, age appropriate . . . " and thus the totality of the records showed Plaintiff's functioning was age-appropriate.  (AR 57-58.)

At the hearing, the ME referenced the consultative psychological exam completed on May 22, 2017, acknowledging Dr. Izzi wasn't able to complete IQ testing because Plaintiff left or didn't want to complete the testing, but that the record noted the assessor thought her functional assessment was age-appropriate.  The ME stated that while there was "some evidence of some mental symptoms . . . they were more family factors where she was more – what I usually see with teenage oppositional issues with her parents and having struggles with her mom and dad, but it was only four sessions that I saw were noted.  I didn't see any individual therapy notes.  There was some notes that were noted as being psychiatric management notes but I didn't see any medication being administered either."  (AR 50-51, 350.)  Specifically, Dr. Izzi's

referenced function assessment stated the following:

> The claimant's father reports that the claimant is able to care for her basic hygiene needs at an age-appropriate level.   During testing, she began to cry.   She wanted to go home.   There were normal obvious speech problems detected.
>
> The Child's cognitive development, the ability to understand and respond to increasingly complex instruction at an age-appropriate manner is not limited.   The Child's communicative development, the ability to initiate and use language in an age-appropriate manner is not limited.   The claimant's motor skill development is appropriate for physical activities   at her age level.   Her ability to interact with peers and adults in an age-appropriate manner is not likely to be limited, as her father stated she gets along, 'good,' with others.   Her ability to engage in an activity for a period of time and at a pace appropriate for her age level may be limited by her overall level of functioning.

(AR 350.)

The Court finds the ALJ reasonably relied on the ME Dr. Buitrago's testimony that Plaintiff's low grades were primarily due to missing assignments from when she was absent; and that while the ALJ acknowledged that Plaintiff had that some learning difficulties, the balance of the evidence showed that there were some areas where Plaintiff could perform better, and the fact that she did not have all low grades suggested she "ha[d] the ability to learn and acquire information" and a less than marked limitation.  (AR 29, 33).  See Jamerson v. Chater, 112 F.3d 1064, 1067 (9th Cir. 1997) ("[C]laimant's special education teacher gave him the equivalent of an 'A' in math and spelling, a 'B' in language, and a 'C' in reading.  Granted, these grades reflect a comparison to other children in the special education class, not the school as a whole. Even so, the ALJ was entitled to rely on this evidence, as he did, to support his conclusion that claimant's grades 'do not correspond to an extreme limitation' in cognitive development."); Mercadal v. Colvin, No. 2:12-CV-2907 AC, 2014 WL 1026129, at *1, 7 (E.D. Cal. Mar. 14, 2014) ("Since she was in the first grade, plaintiff has been in special education or received special services for an unspecified learning disability and attention deficit hyperactivity disorder . . . A reasonable interpretation of the ALJ's decision is that the opinion of Dr. Sheehy and Dr. Tashjian coincides with the ALJ's determination that plaintiff's ability to acquire and use information is improved when she is on medication and when there is a change in her academic

1  environment."); <u>Meredith ex rel. D.H. v. Astrue</u>, No. CV-09-0384-CI, 2011 WL 1303308, at *7

2  (E.D. Wash. Apr. 5, 2011) ("As noted by the ALJ and Dr. McKnight, progressive improvement

3  in his academics was noted in the 2008 IEP, the level of special education support was not

4  increased over the years, and his teacher reported he was fully capable of functioning with the

5  classroom . . . Plaintiff's school grades reflect satisfactory progress and his report card indicates

6  satisfactory effort in multiple subjects . . . The lack of failing grades or negative indicators in his

7  third grade report card is inconsistent with a finding of disability.").  Thus, the aspects of the

8  opinion pertaining to the connection between missing assignments and Plaintiff's lower grades

9  provide reasonable and substantial evidence in support of the ALJ's conclusions, despite the fact

10 that lower test scores also contributed to lower grades, which in turn are impacted by the lack of

11 completed assignments in preparing for the exams.

12        Further the IEP referenced by Dr. Buitrago supports the findings that more missing

13 assignments are tied to lower grades.  (AR 373.)  In this regard, the ALJ also directly considered

14 the teacher questionnaire completed on April 18, 2017.  (AR 31.)  The ALJ noted that with

15 respect to acquiring and using information, and attending and completing tasks, Plaintiff's

16 special education teacher rated Plaintiff as having no problem to an obvious problem (AR 31-

17 32), emphasizing the following details:

18              The teacher also indicated the following, "all math assignments are
               done in class.  There is a teacher and adult math aide to assist all
19             students.  Destiny, up to March, would not seek assistance in math
               until her grade was in the D/F range.  I talked to her mom (Lynn)
20             and Destiny began to improve before the Spring break.  She now
               sits near me (teacher) and seeks assistance much more often." . . .
21             The undersigned places significant weight on the teacher's
               opinion, as she works with the claimant, and knows the claimant
22             limitations and abilities and a fair interpretation of the teacher's
               opinion supports no less than marked limitations with respect to
23             acquiring and using information and attending and completing
               tasks.
24

25 (AR 32.)  The Court agrees with Defendant that when you consider the special education

26 teacher's reporting that Plaintiff did not have marked limitations and that she improved when she

27 sought assistance on a more regular basis (AR 259), it was therefore reasonable to conclude that

28 in a special education environment that would provide additional support, Plaintiff would be able

1  to sufficiently learn information and complete tasks at the community college (AR 34, 50, 259).

2  See Jamerson, 112 F.3d at 1067; Mercadal, 2014 WL 1026129, at *1; Meredith ex rel. D.H.,

3  2011 WL 1303308, at *7.  Again, while Plaintiff focuses on more favorable evidence, Plaintiff

4  has not specifically challenged any of Dr. Buitrago's testimony or the evidence he relied upon,

5  including Dr. Izzi's report, Plaintiff's teacher's questionnaire or IEPs, nor the ALJ's reliance on

6  such evidence.  Plaintiff has not demonstrated that the ALJ's reliance on this evidence in

7  formulating the conclusion regarding Plaintiff's functioning in the domains of her ability to

8  acquire and use information, and in her ability to attend and complete tasks was error, and it is

9  not this Court's function to second guess the ALJ's conclusions and substitute the Court's

10  judgment for the ALJ's; rather, as if the evidence "is susceptible to more than one rational

11  interpretation, it is the ALJ's conclusion that must be upheld."   Ford v. Saul, 950 F.3d 1141,

12  1154 (9th Cir. 2020) (quoting Burch, 400 F.3d at 679); Molina v. Astrue, 674 F.3d 1104, 1111

13  (9th Cir. 2012) ("Even when the evidence is susceptible to more than one rational interpretation,

14  we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from

15  the record.").

16      The ALJ gave some weight to Dr. Izzi's consultative psychological evaluation opinion

17  dated May 23, 2017, which the Court summarized above.  (AR 30.)  The ALJ summarized the

18  opinion as follows: "Dr. Izzi reported the testing results and indicated the test results are not

19  valid, he noted that the claimant subset scores were the lowest measurable level, she became

20  unresponsive to test materials, and she began to cry," before reproducing the most relevant parts

21  of Dr. Izzi's opinion in full within the opinion.  (AR 30, citing AR 350.)

22      Defendant argues that while the intelligence testing results were not valid due to Plaintiff

23  becoming "unresponsive" during the testing (AR 348), Dr. Izzi reviewed the medical and

24  educational records, and conducted a mental status examination and adaptive behavior testing,

25  which served as the basis for his opinion.  (AR 347-349.)  Again, Dr. Izzi found Plaintiff's

26  cognitive development and the ability to understand/respond to increasingly complex instruction

27  in an age-appropriate manner was not limited, in addition to finding no limitations for her age in

28  communicative development, ability to initiate/use language, motor skill development, or ability

23

1   to interact with others.  The Court agrees with the Defendant that Dr. Izzi's opinion as to these

2   areas provides substantive evidence in support of the ALJ's finding that Plaintiff had a less than

3   marked limitation acquiring/using information (AR 30).  See Tonapetyan v. Halter, 242 F.3d

4   1144, 1149 (9th Cir. 2001) ("Dr. Schatz's opinion alone constitutes substantial evidence, because

5   it rests on his own independent examination.").

6          However, Dr. Izzi did note that Plaintiff's ability to engage in an activity for a period of

7   time and at a pace appropriate for her age may be limited by her overall level of functioning.

8   (AR 350.)  Defendant proffers that the statement indicated a lack of certainty as to whether she

9   actually had a limitation, and the doctor's qualification that Plaintiff *may* have a limitation

10  engaging in activities for a period of time certainly does not support that she had a marked or

11  extreme limitation; rather, it supports that she had some level of limitation that was not marked

12  (i.e., it did not seriously interfere with her abilities).  See 20 C.F.R. § 416.926a(e)(2).  The Court

13  finds that the ALJ's overall assessment of the evidence as a whole and his determinations to be

14  supported despite this, because as noted above, the ALJ expressly acknowledged that Dr. Izzi

15  opined she may have a limitation in engaging in an activity for a period of time and at a pace

16  appropriate for her age level, and may be limited by her overall level of functioning, before

17  concluding that Dr. Izzi's findings did not support marked *or* extreme functional limitations.

18  (AR 30.)

19         Finally, Defendant directs the Court to the non-examining state physician opinions of

20  Drs. Solomon and Schwartz, noting they reviewed the complete medical file as of the time they

21  provided their opinions.  Drs. Solomon and Schwartz opined that Plaintiff did not functionally

22  equal the Listings and specifically that she had less than a marked limitation acquiring/using

23  information, and no limitation attending/completing tasks.  (AR 77, 87–88.)  The ALJ assigned

24  these opinions "some weight" and accepted their opinion concerning acquiring/using

25  information; however, the ALJ determined that Plaintiff had limitations with regard to

26  attending/completing tasks and instead found a less than marked limitation in this area.  (AR 29–

27  30).  The Court finds the non-examining physician opinions to be consistent with each other and

28  supported by the record, including Dr. Izzi's report and the teacher questionnaire discussed

previously, as well as Dr. Buitrago's opinion insofar as they all opined Plaintiff had no more than a less than marked limitation in the functional domains at issue, and the ALJ explicitly relied on these opinions in making his own findings (AR 33). See Thomas, 278 F.3d at 957 ("The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record.").

Again, the Court largely agrees with Defendant that Plaintiff has not specifically addressed any deficiencies with the evidence that the ALJ relied upon above, and largely requests the Court to instead accept her own interpretation of evidence to place more significance on Dr. Sheldon's opinion, which the Court addresses in the following section, in determining whether the ALJ failed to properly give weight to the treating physician's opinion. The Court will not here before turning to Dr. Sheldon's opinion in the next section, however, that the ALJ is not required to accept Dr. Sheldon's opinion and may reject the opinion for specific and legitimate reasons, as discussed in the next section of this order.

Nonetheless, in this section of the briefing pertaining to the listings, Plaintiff additionally directs the Court to testimony from the Plaintiff's stepmother, which the Court summarized above. As noted above, Plaintiff has not directly challenged the weight given to Ms. Rossel's testimony, and thus a challenge to the weight afforded to the testimony has been waived. Plaintiff emphasizes testimony that she attended special education; that she had "below average" scores in various achievement categories; that her teacher noted she "struggled with comprehension"; and that she had "failing or close to failing grades in several classes." (Br. 6, citing AR 231, 305, 385, 393, 394, 439).

Defendant argues the fact that Plaintiff was in special education does not automatically mean she is disabled. Defendant did not provide the Court with any citations to support this position, but the Court nonetheless agrees. See Jamerson, 112 F.3d at 1067; Mercadal, 2014 WL 1026129, at *1; Meredith ex rel. D.H., 2011 WL 1303308, at *7. For the reasons stated above, the Court does not find Plaintiff's special education classes or her grades mandate a finding of error, and the ALJ's decision was reasonable and supported by substantial evidence. Id. Further,

1    test scores alone do not establish marked or extreme limitation in a domain, 20 C.F.R. §§

2    416.924a(a)(1)(ii);  20 C.F.R.  416.926a(e)(4),  and no single piece of information taken in

3    isolation can establish whether the child has a "marked" limitation in a domain, 20 C.F.R. §

4    416.926a(e)(4)(i).  For these same reasons, the Court does not find merit to Plaintiff's contention

5    that the ALJ ignored material information such as that Plaintiff was only on track to graduate

6    because she had significant accommodation and structure in her schoolwork, and that she was

7    only going to community college because there was no entrance examination and the school had

8    a special education program, as the ALJ did not ignore this information but rather explicitly

9    acknowledged that Plaintiff had special education and tutoring, Ms. Rossel's testimony about

10   community college, and Dr. Buitrago's testimony about her special education schoolwork and

11   need for special education for two periods per day.

12       In reply briefing, Plaintiff only generally states that rather than addressing the deficits

13   with the ALJ's functional equivalence analysis, Defendant merely recites the evidence the ALJ

14   relied upon in concluding that Plaintiff had less than a marked limitation in the functional

15   domains of acquiring/using information and attending/completing tasks; that like the ALJ,

16   Defendant chooses to disregard material evidence showing that Plaintiff had marked mental

17   limitations, such as: Plaintiff functioned far below grade level in reading comprehension,

18   listening comprehension, math fluency, as well as other subcategories (AR 437); that she

19   required additional supervision and support to complete schoolwork (AR 259, 393); and her

20   treating psychologist noted that she had poor attention to school and home duties, with poor

21   follow through on chores, and difficulty with organizing tasks and becoming distracted (AR

22   362).   Additionally, Plaintiff emphasizes that although she was on course to graduate, and

23   maintained fair to good grades in certain academic subjects, she was only able to do so because

24   she had significant accommodation and structure in her schoolwork (AR 62, 393).  (Reply 2-3.)

25   The Court does not find Plaintiff's reply substantively addresses the Defendant's presentation of

26   the ALJ's opinion as reasonable, and supported by substantial evidence.

27       Accordingly, the Court finds the ALJ's determination Plaintiff has less than a marked

28   limitation in acquiring and using information and in attending and completing tasks, and

1 | determination that Plaintiff's developmental and learning disorders did not functionally equal the

2 | relevant listings, was free from remandable error and supported by substantial evidence in the

3 | record. Jamerson, 112 F.3d at 1067; Mercadal, 2014 WL 1026129, at *1; Meredith ex rel. D.H.,

4 | 2011 WL 1303308, at *7; Ford, 950 F.3d at 1154; Thomas, 278 F.3d at 957; Tonapetyan, 242

5 | F.3d at 1149.

6 |        **B.**    **Whether the ALJ failed to Provide Specific and Legitimate Reasons for**

7 |                **Discounting the Opinion of Dr. Sheldon**

8 |     Plaintiff submits that the ALJ erred by failing to provide specific and legitimate reasons

9 | for discounting the treating opinion of Plaintiff's treating psychologist, Dr. Ronald Sheldon. (Br.

10 | 9-12.)

11 |        1.    Legal Standards and Applicability of 2017 Regulations

12 |     The weight to be given to medical opinions depends upon whether the opinion is

13 | proffered by a treating, examining, or non-examining professional. See Lester v. Chater, 81 F.3d

14 | 821, 830-831 (9th Cir. 1995). In general a treating physician's opinion is entitled to greater

15 | weight than that of a nontreating physician because "he is employed to cure and has a greater

16 | opportunity to know and observe the patient as an individual." Andrews v. Shalala, 53 F.3d

17 | 1035, 1040-41 (9th Cir. 1995) (citations omitted). If a treating physician's opinion is

18 | contradicted by another doctor, it may be rejected only for "specific and legitimate reasons"

19 | supported by substantial evidence in the record. Ryan v. Commissioner of Social Sec., 528 F.3d

20 | 1194, 1198 (9th Cir. 2008) (quoting Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005)).

21 |     Where the treating physician's opinion is contradicted by the opinion of an examining

22 | physician who based the opinion upon independent clinical findings that differ from those of the

23 | treating physician, the nontreating source itself may be substantial evidence, and the ALJ is to

24 | resolve the conflict. Andrews, 53 F.3d at 1041. However, if the nontreating physician's opinion

25 | is based upon clinical findings considered by the treating physician, the ALJ must give specific

26 | and legitimate reasons for rejecting the treating physician's opinion that are based on substantial

27 | evidence in the record. Id.

28 |     The contrary opinion of a non-examining expert is not sufficient by itself to constitute a

1    specific, legitimate reason for rejecting a treating or examining physician's opinion, however, "it

2    may constitute substantial evidence when it is consistent with other independent evidence in the

3    record." Tonapetyan, 242 F.3d at 1149.  The ALJ need not accept the opinion of any physician

4    that is brief, conclusory, and unsupported by clinical findings.  Thomas, 278 F.3d at 957.

5         Defendant highlights that despite Plaintiff's discussion of the regulation changes in her

6    brief (Br. at 9–10), they do not apply in this case, and Plaintiff agrees that the "specific and

7    legitimate" reasons standard applies to Dr. Sheldon's opinion.  Defendant submits that insofar as

8    Plaintiff argues that Ninth Circuit case law articulating a preference for opinions from treating

9    physicians (based on the old regulations) continues to apply after the 2017 regulation changes,

10   such position must be rejected.  See Carr v. Saul, No. 1:20-cv-00217-EPG, 2021 WL 1721692, at

11   *5 (E.D. Cal. Apr. 30, 2021) (agreeing the treating-physician rule must yield to the intervening

12   regulation); Jones v. Saul, No. 2:19-cv-01273-AC, 2021 WL 620475, at *8-9 (E.D. Cal. Feb. 17,

13   2021) (finding that the new regulation displaces contrary pre-existing case law).[5]

14        The Court need not address the issue as such determination is not needed to make a

15   decision in this action.  This is because Defendant is correct that the new, apparently Defendant-

16   _____

17   [5]  The Social Security Administration revised its regulations regarding the consideration of medical evidence —
     applying those revisions to all claims filed after March 27, 2017.  See Revisions to Rules Regarding the Evaluation

18   of Medical Evidence, 82 FR 5844-01, 2017 WL 168810 (Jan. 18, 2017).  Under the updated regulations, the agency
     "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or
     prior administrative medical finding(s), including those from [the claimant's own] medical sources."  20 C.F.R. §§

19   404.1520c(a), 416.920c(a).  Thus, the new regulations require an ALJ to apply the same factors to all medical
     sources when considering medical opinions.  See id.  Further, the regulations governing claims filed on or after

20   March 27, 2017, no longer mandate particularized procedures that the ALJ must follow in considering opinions from
     treating sources (e.g., requirement that ALJ must 'give good reasons' for the weight given a treating source opinion).

21   See 20 C.F.R. § 404.1520c(b) (the ALJ "is not required to articulate how [he] considered each medical opinion or
     prior administrative medical finding from one medical source individually.").

22
     "When a medical source provides one or more medical opinions or prior administrative medical findings, [the ALJ]

23   will consider those medical opinions or prior administrative medical findings from that medical source together
     using" the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4)

24   specialization; (5) other factors that "tend to support or contradict a medical opinion or prior administrative medical
     finding."  20 C.F.R. §§ 404.1520c(a), (c)(1)–(5).  The most important factors to be applied in evaluating the

25   persuasiveness of medical opinions and prior administrative medical findings are supportability and consistency.  20
     C.F.R. §§ 404.1520c(a), (b)(2).[5]  Accordingly, the ALJ must explain in his decision how persuasive he finds a

26   medical opinion and/or a prior administrative medical finding based on these two factors.    20 C.F.R. §
     404.1520c(b)(2).  However, the ALJ "may, but [is] not required to, explain how [he] considered the [other

27   remaining factors]," except when deciding among differing yet equally persuasive opinions or findings on the same
     issue.  20 C.F.R. § 404.1520c(b)(2)–(3).  Further, the ALJ is "not required to articulate how [he] considered

28   evidence from nonmedical sources."  20 C.F.R. § 404.1520c(d).

favorable regulations, do not apply to this action.

The Social Security Administration revised its regulations regarding the consideration of medical evidence — applying those revisions to all claims filed after March 27, 2017.  See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, 2017 WL 168819 (Jan. 18, 2017).  Here, it appears the confusion regarding the applicability of the regulations stems from the fact the application and the protective filing date fell around the applicability date for the new regulations.  On March 1, 2017, Plaintiff's application was protectively filed, and the written application was filed on April 3, 2017 (AR 196-207).  Defendant correctly uses the protective filing date.  See 20 C.F.R. § 416.345 ("We will use the date of an oral inquiry about SSI benefits as the filing date of an application for benefits only if the use of that date will result in your eligibility for additional benefits and the following requirements are met . . . [listing procedural requirements not in dispute]."); Coleman v. Astrue, No. C 08-03789 LB, 2010 WL 2803374, at *2 (N.D. Cal. July 14, 2010) ("If a claimant makes an oral or written inquiry about SSI benefits before filing a formal written application, the Social Security Administration uses the date of the earlier inquiry as the filing date.").  Significantly, in addition to Defendant conceding that the apparently more claimant favorable pre-2017 regulations are applicable due to the protective filing date, Plaintiff's arguments, although incorrectly framed, still substantively were presumed to apply to the correct specific and legitimate reasons standards.  See P.H. v. Saul, No. 19-CV-04800-VKD, 2021 WL 965330, at *2 (N.D. Cal. Mar. 15, 2021) ("after new Social Security Administration regulations regarding the evaluation of medical opinions went into effect on March 27, 2017, both sides continue to base their arguments on the so-called 'treating physician rule.'  No one says whether the February 6, 2017 protective filing date for P.H.'s DIB application (AR 174) affects the analysis as to which set of regulations applies.  For the reasons discussed below, the Court concludes that under either set of regulations, the ALJ properly evaluated Dr. Dixit's opinion, but erred in his assessment of Dr. Rana's opinion.").

/ / /

/ / /

1   2. <u>Plaintiff's Primary Arguments</u>

2   Plaintiff summarizes that on August 29, 2017, Plaintiff's treating psychologist, Dr.

3 Sheldon, opined that: (1) Plaintiff had extreme limitations in the functional domains of acquiring

4 and using information, attending and completing tasks, and caring for herself; and (2) that

5 Plaintiff had a marked limitation in the functional domain of interacting and relating to others

6 (AR 359-362).  (Br. 9.)  Plaintiff states that in support of this opinion, Dr. Sheldon noted that

7 Plaintiff was in special education; had impairments in social and academic functioning, as well

8 as deficits in attention and cognition; had poor attention to school and home duties, with poor

9 follow through on chores and difficulty organizing tasks; and that she was distracted and

10 forgetful (AR 362).  (Br. 9.)  Plaintiff summarizes that the ALJ assigned little weight to Dr.

11 Sheldon's opinion because the ALJ found (1) his contemporaneous treatment notes did not

12 support his observations and assessment, and (2) the evidentiary record did not support marked

13 or extreme limitations.

14   Plaintiff submits that the ALJ's rationale was not legitimate and contrary to the record

15 evidence for the following reasons: (1) Dr. Sheldon's treatment notes supported his opinion, as

16 Dr. Sheldon regularly noted that Plaintiff exhibited poor insight and judgment and made minimal

17 progress with her mental disorder (AR 331, 340, 354, 357, 397); (2) Dr. Sheldon's opinion was

18 consistent with other evidence in the record, including Plaintiff's fluctuating grades at school

19 despite a highly supportive environment and special accommodations including special

20 education classes, additional time on tests and assignments, and repeated instructions (AR 59-60,

21 305, 393-394); and (3) this evidence along with Plaintiff's inability to acquire skills during a

22 cooking class and her need for in-home support services to attend to her personal care, supported

23 Dr. Sheldon's assessment of marked to extreme mental limitations (AR 64, 359-362).  (Br. 12.)

24   3. <u>The ALJ Provided Specific and Legitimate Reasons to Discount Dr. Sheldon's
Opinion</u>

25

26   In full, the ALJ stated the following when assigning reduced weight to Dr. Sheldon's

27 August 29, 2017 medical source statement:

28     Dr. Sheldon stated the claimant has extreme limitations in

> acquiring and using information, attending and completing tasks as well as extreme limitations with respect to the claimant's ability to care for herself. He referenced the claimant has marked limitations in interacting and relating with others, and no limitations in moving about as well as no limitations with respect to her health and physical well-being. He references at the end of the statement that the claimant has impairments in social, academic and mental inattention, cognition, poor attention to school and home duties. Poor follow through on chores. Difficulty organizing tasks and distracted and forgetful . . .Although Ms. Rossel stated the claimant has been treating with Dr. Sheldon since approximately 2016, and he is knowledgeable regarding the claimant's treatment, care, limitations/abilities, and prognosis, yet his contemporaneous treatment notes do not support the observations and assessments contained in his medical source statement. Moreover, the evidentiary record does not support marked or extreme limitations. In addition, the undersigned is mindful that Dr. Sheldon completed a note on March 23, 2017, requesting the claimant be provided Social Security benefits and he outlined the claimant's diagnoses, yet he offered no analysis or rationale with respect to functional limitations . . . The undersigned has reviewed Dr. Sheldon's opinions and places little weight on his functional assessment in evaluating the claimant's limitations.

(AR 30-31.)

As discussed above, in addition to being contradicted by the opinion of examining physician Dr. Izzi, the opinion of Dr. Sheldon was contradicted by the two nonexamining physicians, Drs. Solomon and Schwartz. Thus, the ALJ could properly reject Dr. Sheldon's opinion by giving specific and legitimate reasons for doing so. See Ford, 950 F.3d at 1154 ("Because Dr. Medani's opinions regarding Ford's functional capacity were contradicted by the reports of two non-examining physicians, the ALJ could reject the opinions by giving 'specific and legitimate reasons' for doing so."); see also Thomas, 278 F.3d at 957 ("The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record.").

As for the ALJ's first reason for discounting Dr. Sheldon's opinion, that "his contemporaneous treatment notes do not support the observations and assessments contained in his medical source statement" (AR 30–31, 360–61), Defendant contends Plaintiff challenge to this finding is narrow, with Plaintiff only arguing the treatment notes supported his opinion, stating Dr. Sheldon "regularly noted that Plaintiff exhibited poor insight and judgment and made minimal progress with her mental disorder." (Br. 11-12, citing AR 331, 340, 354, 357, 397.)

1   Defendant correctly emphasizes "[t]o be clear," that Dr. Sheldon supported his opinion that

2   Plaintiff had extreme limitations acquiring/using information and attending/completing tasks, by

3   indicating that Plaintiff had "impairments in social, academic and mental inattention, cognition";

4   that she had poor attention to school and home duties, poor follow through on chores, and

5   difficulty organizing tasks; and that she was distracted and forgetful.  (AR 360, 362).

6          The Court finds substantial evidence in the record to support the ALJ's finding that Dr.

7   Sheldon's contemporaneous treatment notes do not support the observations and assessments

8   contained in the opinion.  Smolen, 80 F.3d at 1279 ("Substantial evidence means more than a

9   scintilla, but less than a preponderance.") (internal quotations and citations omitted).

10  Specifically, Dr. Sheldon's treatment note dated January 19, 2017, states that Plaintiff had

11  euthymic mood; full affect; clear speech; logical thought processes; normal perception; normal

12  thought content; normal cognition; normal insight; normal judgment; in addition to noting an

13  "Intelligence estimate: Average."  (AR 319.)   The treatment note also states that Plaintiff

14  displays insight into her behavior and illness; that the level of insight was fair; that her judgment

15  as related to behaviors was fair; and that she was making some progress.  (AR 320.)  In the last

16  treatment in the record from Dr. Sheldon, dated August 9, 2018, Dr. Sheldon reported that

17  Plaintiff had a good level of insight, fair judgment (as it related to behaviors), and she made

18  "some progress," as indicated under "Summary of Progress."  (AR 404.)  In both treatment

19  notes, Plaintiff's diagnosis/assessment was listed as "Other developmental disorders of scholastic

20  skills," noted as "Mild."  (AR 320, 404.)  The Court concludes these findings provide substantial

21  evidence for the ALJ's conclusion that Dr. Sheldon's assessment that Plaintiff had "extreme"

22  limitations in the functional domains at issue were contradicted by treatment notes.

23  Inconsistency with the objective findings in the medical record is a specific and legitimate reason

24  to reject a physician opinion.  See Ford, 950 F.3d at 1154 ("Among other reasons, the ALJ stated

25  that Dr. Medani's opinion regarding Ford's functional capacity was inconsistent with medical

26  evidence, including previous medical opinions contained in his own notes.  This conclusion was

27  supported by substantial evidence in the record.  For example, Dr. Medani's opinion indicates

28  that Ford could perform manipulative movements with her hands for only five percent of the day,

but his treatment notes state that Ford had "very mild" carpal tunnel syndrome.   A conflict between a treating physician's medical opinion and his own notes is a 'clear and convincing reason for not relying on the doctor's opinion,' and therefore is also a specific and legitimate reason for rejecting it."); see also Thomas, 278 F.3d at 957 ("The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings."); Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008); Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600–02 (9th Cir. 1999.

The ALJ also concluded that the evidence of record did not support marked or extreme limitations.  (AR 31.)   As noted above, Plaintiff limits her argument to contending the opinion was consistent with her fluctuating grades, special education accommodations, and that the fact she could not acquire basic skills such a cooking and self-care.  Defendant counters that Plaintiff is again simply asking the Court to place greater significance on particular pieces of evidence, but that Plaintiff ignores that Dr. Sheldon's opinion was an outlier compared to Drs. Buitrago, Izzi, Solomon, and Schwartz, that the Court discussed in greater detail in the previous section, in addition to being inconsistent with Plaintiff's teacher, who reported she had (at most) mild problems in activities relating to acquiring/using information and attending/completing tasks (AR 259–60).  For similar reasons discussed in the preceding section in assessing the various evidence utilized by the ALJ in making the functional domain determinations, the Court finds the ALJ's finding that Dr. Sheldon's findings were contradicted by the evidence of record to be supported by substantial evidence, and to be a specific and legitimate reason for discounting the opinion of Dr. Sheldon.   Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007) ("If there is 'substantial evidence' in the record contradicting the opinion of the treating physician, the opinion of the treating physician is no longer entitled to 'controlling weight.' ") (citing 20 C.F.R. § 404.1527(d)(2)); see also Jamerson, 112 F.3d at 1067; Mercadal, 2014 WL 1026129, at *1; Meredith ex rel. D.H., 2011 WL 1303308, at *7; Ford, 950 F.3d at 1154; Thomas, 278 F.3d at 957; Tonapetyan, 242 F.3d at 1149.

/ / /

/ / /

1

**V.**

2

**CONCLUSION AND ORDER**

3    Based on the foregoing, the Court concludes that the ALJ did not commit error in finding

4    Plaintiff's developmental and learning disorders did not functionally equal the relevant listings

5    based on the findings that Plaintiff had less than a marked limitation in acquiring and using

6    information and in attending and completing tasks.  Additionally, the ALJ provided specific and

7    legitimate reasons for discounting the treating physician Dr. Sheldon's opinion.  The Court finds

8    the ALJ's decision to be supported by substantial evidence in the administrative record, and free

9    from remandable legal error.

10    Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the

11    Commissioner of Social Security is DENIED.  It is FURTHER ORDERED that judgment be

12    entered in favor of Defendant Commissioner of Social Security and against Plaintiff Destiny

13    Marie Sanchez.  The Clerk of the Court is DIRECTED to CLOSE this action.

14

15    IT IS SO ORDERED.

16    Dated:   **April 18, 2022**

UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25

26

27

28